# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SANDER SABA,<br><br>     *Plaintiff*,<br><br>   -against-<br><br>ANDREW M. CUOMO, in his official capacity as Governor of the State of New York; and MARK J. F. SCHROEDER, in his official capacity as Commissioner of the New York State Department of Motor Vehicles,<br><br>     *Defendants*. | Civil Action No. 1:20-cv-05859 |

## <u>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff Sander Saba ("Plaintiff" or "Mx. Saba") brings this Complaint, by and through their attorneys, against Defendants Andrew M. Cuomo, in his official capacity as Governor of the State of New York ("Governor Cuomo"), and Mark J. F. Schroeder, in his official capacity as Commissioner of the New York State Department of Motor Vehicles ("Commissioner Schroeder") (collectively, "Defendants"), and respectfully alleges as follows:

### <u>INTRODUCTION</u>

1.  Mx. Saba is a nonbinary transgender New York resident who, consistent with their obligations under New York state law, wishes to obtain a New York driver's license that accurately reflects their nonbinary gender identity by using the gender marker "X."

2.  Mx. Saba, who was born in New York City, has a birth certificate that accurately reflects their gender with an "X" marker, given that their gender identity is neither exclusively female nor exclusively male.  Until November 2020, Mx. Saba had a driver's license from the

Commonwealth of Pennsylvania that accurately reflected their nonbinary gender with an "X" gender marker.

3.      Notwithstanding their nonbinary gender identity and that their other identity documents accurately reflect their nonbinary gender, Mx. Saba is barred from obtaining a New York driver's license that accurately reflects and communicates their nonbinary identity, both facially and electronically.  Specifically, under the current policy, the New York State Department of Motor Vehicles ("DMV") does not issue driver's licenses with a gender marker other than "M" for male or "F" for female on its face, nor does it record and communicate electronically a person's gender as anything other than male or female (hereinafter, the "Gender Marker Policy").[1]

4.      As a result of the Gender Marker Policy, Mx. Saba, who is a New York resident, was unable to exchange their Pennsylvania driver's license for a New York's license, as required by New York law, before it expired.

5.      Possessing accurate identification documents that are consistent with a person's gender identity—a person's core internal sense of their own gender—is essential to social and economic well-being.  A driver's license is a critical and ubiquitous identification document used in many settings to verify a person's identity.  Access to employment, education, housing, health care, banking services, travel, and other government services hinges on having convenient and accessible documentation that accurately reflects that identity.

6.      For many nonbinary people, the gender designation on their identification documents is often inaccurate, because the sex they were assigned at birth ("birth-assigned sex"),

---

[1] During the course of litigation, the DMV offered Mx. Saba a manually generated license that would have an "X" marker on its face but would still reflect or communicate Mx. Saba's gender as male or female through electronic means.  Mx. Saba rejected this offer as insufficient as it exacerbates rather than fixes some of the harms that emanate from the Gender Marker Policy. *See infra*.

typically the binary options of male or female, does not match their gender identity, which is neither exclusively female nor exclusively male.  Correcting the gender marker designation on identity documents is thus critically important for nonbinary people.  Accurately identifying one's gender to the world is essential to one's personhood and ability to navigate the world.

7.     The State of New York has recently taken several steps to recognize its constitutional obligations to provide government documentation to some transgender New Yorkers that accurately reflects their gender identity.  Yet, the State of New York has left out a class of transgender residents that studies suggest makes up nearly 35% of transgender people nationwide (and likely more within the State of New York):  those whose gender identity does not reflect the traditional gender binary of female and male, i.e., nonbinary people.[2]

8.     New York's outdated Gender Marker Policy prohibiting "X" gender marker designations on state-issued driver's licenses stands in sharp contrast to an increasing number of jurisdictions which already provide "X" gender markers for state issued driver's licenses, including Arkansas, California, Colorado, Connecticut, Hawaii, Maine, Maryland, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, Nevada, Oregon, Pennsylvania, Rhode Island, Utah, Virginia, Vermont, and Washington.

9.     New York's Gender Marker Policy further defies logic because New York City and New York State permit nonbinary people to obtain birth certificates with an "X" gender marker so that they accurately reflect nonbinary people's gender identity.  New York City has permitted nonbinary people born in the city to obtain a birth certificate with an "X" gender marker, so that they accurately reflect their gender, since 2019.  And in June 2020, New York State's Department of Health began permitting nonbinary people born in New York State (other than in New York

---

[2] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, 18, 45 (2016).

City) to obtain birth certificates with a gender-neutral gender marker, so that they accurately reflect nonbinary people's gender identity.

10.     Furthermore, New York's Gender Marker Policy is also incongruous with Governor Cuomo's stated commitment to "enacting critical protections for transgender individuals," and that "New York will always stand up for every single member of our LGBTQ family no matter what happens in Washington."[3]

11.     By forcing Mx. Saba to identify as either male or female on their driver's license, the Gender Marker Policy effectively deprives nonbinary people in New York State from access to driver's licenses (and state identification cards) they can use to accurately identify themselves. This communication occurs both visually through the face of the driver's license as well as electronically through the record maintained in connection with the license that is transmitted when a license is scanned or a person's DMV record is requested.  The policy thus establishes a barrier to nonbinary persons' full engagement in society.

12.     The Gender Marker Policy, which each Defendant enforces, violates the United States Constitution's guarantees of equal dignity; equal protection of the laws; fundamental rights to privacy, liberty, and autonomy; and freedom of speech.  These Constitutional guarantees protect personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity, such as a person's gender identity.

13.     The Gender Marker Policy, which each Defendant enforces, also violates Mx. Saba's right to be free from unlawful discrimination in the provision of services under New York Human Rights Law, N.Y. Exec. Law § 296.

---

[3] *See* Press Release, New York Governor's Press Office, *On Transgender Day of Remembrance, Governor Cuomo Announces New Actions to Protect Transgender and Gender Non-Conforming New Yorkers* (Nov. 20, 2019), http://tinyurl.com/tuvs6c6 (last accessed May 3, 2021).

14.     No compelling, important, or even legitimate governmental justification supports New York State's refusal to provide nonbinary persons with accurate driver's licenses that reflect their gender identity.

## JURISDICTION AND VENUE

15.     This action arises under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state or territorial law of rights secured by the United States Constitution.

16.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws and the Constitution of the United States.

17.     This Court has supplemental jurisdiction over Defendants with respect to Plaintiff's state law claim pursuant to 28 U.S.C. § 1367 because that claim is so related to Plaintiff's federal claims that they form part of the same case or controversy.

18.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because Plaintiff resides within this District, Defendants have offices within this District, and a substantial part of the events that gave rise to Plaintiff's claims occurred within this District.

19.     This Court has the authority to enter a declaratory judgment to provide preliminary and permanent injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

20.     Plaintiff  Mx. Saba is 26 years old and was born on Staten Island in New York. Mx. Saba is a nonbinary transgender resident of the City of New York, specifically Queens, and uses the pronouns they/them/theirs.  In accordance with New York law, Mx. Saba wished to exchange their Pennsylvania driver's license, which accurately reflected their gender identity by using an "X" gender marker, for an equivalent New York State driver's license that also accurately reflects their gender identity by using an "X" gender marker.  As a New York resident, Mx. Saba desires to possess to a New York driver's license so that they may have a government-issued

accurate identification document that will permit them to, among other things, drive, engage in interstate travel with a REAL ID Act compliant identification document, and generally present to employers, banking institutions, and others.

21.     Defendant Governor Cuomo is sued in his official capacity as Governor of the State of New York.  Governor Cuomo is charged with the duty to "take care that the laws are faithfully executed," N.Y. Cons. Art. 4 § 3, including New York State's Vehicle and Traffic Law, and supervises the implementation and enforcement of the Public Health Law and its attendant regulations.  Under N.Y. Vehicle & Traffic Law § 200, Governor Cuomo has the power to appoint the Commissioner of the DMV, by and with the advice and consent of the New York Senate. Governor Cuomo has knowingly condoned and acquiesced in the acts barring Plaintiff from living consistent with their nonbinary gender identity, namely the prohibition against issuing New York driver's licenses with gender markers other than "M" for male or "F" for female, on their face or electronically.

22.     Defendant Governor Cuomo is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

23.     Defendant Commissioner Schroeder is sued in his official capacity as Commissioner of DMV.  Commissioner Schroeder is charged with enacting, amending, and repealing the rules and regulations which regulate and control  the exercise of the powers of the DMV and the performance of the duties of its officers, agents, and other employees thereof, including the procedures related to the content and issuance of driver's licenses.  Commissioner Schroeder also has supervisory authority over the deputy commissioners of motor vehicles, inspectors, examiners, and other assistants and employees of the department.  Commissioner Schroeder has knowingly encourage, condoned, and acquiesced in the acts barring Plaintiff from living consistent with their nonbinary gender identity, namely the prohibition against issuing New York driver's licenses with gender markers other than "M" for male or "F" for female, on their face or electronically.  Commissioner Schroeder's administration and enforcement of the New York vehicle and traffic laws are actions under the color of state law.

24.     Defendant Commissioner Schroeder is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

## FACTUAL BACKGROUND

**A.     Background Information Regarding Gender Identity, Transgender Status, and Gender Dysphoria.**

25.     Gender identity is a person's core internal sense of who they are.  It is a sex-related characteristic and may include a person's identification as female, male, or neither.

26.     Self-recognition of one's own gender identity develops over time.  Every person has a gender identity.

27.     There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to that person's health and well-being.

28.     Although there is no singular definitive factor that determines gender identity, biological factors, including sexual differentiation in the brain, have a role in gender identity development.

29.     A nonbinary person may have a gender identity that blends elements of being a man or a woman, or a gender identity that is neither male nor female.[4]  Those with a nonbinary gender identity, however, share the common trait that they do not neatly fit into categories of "man" or "woman," or "male" or "female."[5]

30.     The idea that there are only two genders is sometimes called a "gender binary." Therefore, "nonbinary" is a term people use to describe genders that do not fall into one of these two categories.

31.     Nonbinary gender identities are not new.  Many societies have long acknowledged the existence of those who do not ascribe to the traditional gender binary of male and female. Examples include Indian Hijra, Thai Kathoey, Indonesian Waria, various Two-Spirit identities of

---

[4] *See* Jessica A. Clark, *They, Them, and Theirs*, 132 Harv. L. Rev. 894, 905 (2019).

[5] Nat'l Ctr. for Transgender Equality, *Understanding Non-Binary People: How to Be Respectful and Supportive* (Oct. 5, 2018), https://tinyurl.com/y9sv5lct (last accessed April 28, 2021).

First Nations tribes, and South American Machi identities, among others, each with a distinct meaning not reducible to man or woman.

32.     Having a nonbinary gender identity is a normal variation of human development. Thus, a nonbinary identity implies no impairment in judgment, stability, reliability, or general social or vocational capabilities.[6]

33.     The phrase "birth-assigned sex" refers to the sex recorded on a person's birth certificate at the time of that person's birth.  Typically, a person is assigned a sex on their birth certificate solely based on the appearance of external genitalia at the time of birth.  Other sex-related characteristics (such as a person's chromosomal makeup or gender identity, for example) are typically not assessed or considered at the time of birth.  This leaves the potential for an incongruence between a person's birth-assigned sex and other sex-related characteristics, including their gender identity.

34.     "Defining a person's sex is not just a straightforward matter of genitalia: sex is made up of a range of factors that include reproductive organs, hormones, secondary sex characteristics, gender role, gender expression, and gender identity."[7]

35.      A cisgender person is a person whose gender identity aligns with their birth-assigned sex.  A cisgender man's gender is male (and he was assigned the sex of male at birth) and a cisgender woman's gender is female (and she was assigned the sex of female at birth).

36.     As New York law recognizes, a transgender person is a person whose gender identity diverges from the sex they were assigned at birth.  *See*, *e.g.*, 9 NYCRR § 466.13(b)(2).

37.     A transgender man's gender is male (and he was assigned the sex of female at birth); a transgender woman's gender is female (and she was assigned the sex of male at birth); and a nonbinary transgender person's gender is neither exclusively male nor exclusively female (and they were assigned the sex of male or female at birth).

---

[6] Jack Drescher et al., *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals*, American Psychiatric Association (2018).

[7] 1 Sexual Orientation and the Law § 10:1 (2018) (internal footnote and citations omitted).

38.     As such, transgender status is inextricably linked to a person's sex.

39.     There are an estimated 1.4 million adults in the United States that identify as transgender, according to the Williams Institute, a leading research center on sexual orientation and gender identity law and public policy.[8]  Of those, approximately 35 percent identify as nonbinary.[9]

40.     Nonbinary gender identities are not only a normal variation of human development; they are prevalent.  Over one-third of Americans in their teens and early 20s know someone who uses gender-neutral pronouns, according to a 2019 study by Pew Research Center.[10]

41.     Living in a manner consistent with one's gender identity is critical to the health and well-being of any person, including a transgender person.

42.     Attempts to change a person's gender identity to bring it into alignment with the person's birth-assigned sex are not only unsuccessful, but also dangerous, risking psychological and physical harm, including suicide.

43.     The incongruence between a transgender person's gender identity and their birth-assigned sex can sometimes be associated with gender dysphoria.  Gender dysphoria refers to the clinically significant distress that can result when a person's gender identity differs from their birth-assigned sex, which is often exacerbated by society's treatment of transgender people, forcing them into the wrong gender category or role.

44.     Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (2013) ("DSM-5"), as well as by other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.

---

[8] Jody L. Herman et al., *Age of Individuals Who Identify as Transgender in the United States*, 2 (2017), https://tinyurl.com/y6q2mbdx (last accessed May 3, 2021).

[9] Sandy E. James et al., The Report of the 2015 U.S. Transgender Survey, 18, 45 (2016).

[10] A.W. Geiger and Nikki Graf, *About one-in-five U.S. adults know someone who goes by a gender-neutral pronoun*, Pew Research Center (Sept. 5, 2019), https://tinyurl.com/y4yr9m3e (last accessed May 3, 2021).

45.     If left untreated, gender dysphoria may result in psychological distress, anxiety, depression, suicidal ideation, and even self-harm.

46.     Treatment for gender dysphoria is guided by the *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, published by the World Professional Association of Transgender Health ("WPATH").[11]  The WPATH Standards of Care reflect the professional consensus about the psychological, psychiatric, hormonal, and surgical management of gender dysphoria.  Medical treatment for gender dysphoria must be individualized and tailored to the medical needs of each patient/person.

47.     The process by which transgender people come to live in a manner consistent with their gender identity, rather than their birth-assigned sex, is known as transitioning.

48.     The steps that a transgender person takes to transition, as well as to treat their gender dysphoria, vary with each individual's specific needs, but generally include one or more of the following: (1) social transition; (2) hormone therapy; and/or (3) gender-affirming surgery.

49.     Social transition entails a transgender person living in a manner consistent with their gender identity.  For a nonbinary person, social transition may include, among other things, changing their name; using gender-neutral pronouns like they/them; and otherwise living openly as a nonbinary person in all aspects of everyday life.

50.     Social transition requires that transgender people be treated according to who they are by family members, coworkers, community members, and public and private entities.  Social transition requires a nonbinary person be recognized as nonbinary, just as it requires that a transgender woman or a transgender man be recognized as a woman or a man, respectively.  The refusal to treat a transgender person in a manner consistent with their gender identity is harmful to that person's dignity and well-being.  Social transition is thus an important aspect of transition for a transgender person, including nonbinary persons.

---

[11] *See* Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* 8 (7th ed. 2012) ("WPATH Standards of Care") https://tinyurl.com/zwecyatx (last accessed May 3, 2021). .

51.     Living in a manner consistent with one's gender identity is thus critical to the health and well-being of transgender people and is a key aspect of treatment for those who suffer from gender dysphoria.[12]

52.     One integral component to social transition is correcting identity documents to accurately reflect one's gender identity.  Changing one's name and gender marker on identification documents, such as birth certificates, passports, and driver's licenses, can be a crucial milestone in social gender affirmation.

53.     Having identification documents that accurately reflect a person's gender identity is also a matter of safety.  The United States Transgender Survey estimated that 32 percent of respondents who had presented an identification that did not match their gender presentation had a negative experience, including verbal harassment (25 percent), denial of service (16 percent), and assault (2 percent).[13]

54.     Unsurprisingly, discrimination, including difficulty in obtaining government identity documents consistent with a person's gender identity, can be damaging to the mental health of transgender and gender diverse individuals.[14]  And despite the prevalence of nonbinary gender identities, transgender people's experiences with education, health care, employment, and policing suggest that those with nonbinary gender identities are suffering significant bias and in some cases are at higher risk for discrimination and violence than transgender men and women.[15]

---

[12] *See* Ayden I Scheim et al., *Gender-concordant identity documents and mental health among transgender adults in the USA: a cross-sectional study*, 5 Lancet Pub. Health e196, e197 (2020) (noting that gender affirmation, defined as an interpersonal and social process of recognizing and actualizing one's gender identity, may improve the mental health of transgender adults in the United States).

[13] James et al., *supra* note 8 at 89-90.

[14] Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals*.

[15] Clark, *They, Them, and Theirs*, 132 Harv. L. Rev. at 899-900 (quoting Jack Harrison et al., *A Gender Not Listed Here: Genderqueers, Gender Rebels, and OtherWise in the National Transgender Discrimination Survey*, 2 LGBTQ Pol'y J. Harv. Kennedy Sch. 13, 13 (2011–2012)).

**B.      Recognition of Nonbinary Persons' Identities in the United States.**

55.      As of July 1, 2020, at least twenty states, as well as the District of Columbia allow residents to obtain a driver's license with an "X" gender marker.   Among those states are: Arkansas, California, Colorado, Connecticut, Hawaii, Maine, Maryland, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, Nevada, Oregon, Pennsylvania, Rhode Island, Utah, Virginia, Vermont, and Washington.[16]

56.      In addition, New York City, New York State, and New Jersey allow people born in their respective jurisdictions to obtain birth certificates with an "X" gender marker, and New York City allows its residents to obtain NYC Identification Cards with an "X" gender marker.

57.      Many states that provide nonbinary gender designations on identity documents— California, Colorado, Maine, Minnesota, Nevada, New Jersey, Oregon, Vermont, and Washington—recently explained that adding "X" gender markers to their identity documents was "neither complex nor disruptive," and also advanced their obligation "to ensure the public safety and well-being of their residents."   *See* Brief for States of California et al. as *Amici Curiae* Supporting Appellee at 2, *Zzym v. Pompeo*, No. 18-1453 (10th Cir. May 12, 2020).  In fact, those states expressly found that "the implementation of a nonbinary gender marker has not resulted in disruption for agencies issuing identification documents or for government and private actors who rely on them."  *Id.* at 7.

58.      The lack of burden stems, in part, from the existence of national and international standards that already recognize nonbinary gender markers on identification documents that ease the implementation of systems recognizing nonbinary identities.  For example, the American Association of Motor Vehicle Administrators ("AAMVA"), a standard-setting organization for driver's licenses and identification cards for all jurisdictions in North America, adopted in 2016 a

---

[16] *See* Movement Advancement Project, *Identity Documents Laws and Policies*, https://tinyurl.com/y5ddxu4f (last updated June 24, 2020) (last accessed May 3, 2021).

standard of permitting an "X" gender designation, in addition to the M and F options, on state identification documents.[17]

59.     At least one member of the New York DMV previously sat on the AAMVA's board.

60.     AAMVA was not the first standard-setting organization to recognize the importance of allowing nonbinary people to have gender markers that accurately reflect their gender identity.  AAMVA merely followed the standards for the content and design of passports set by the International Civil Aviation Organization ("ICAO").  The ICAO allows for use of an "X" gender marker in addition to "M" and "F"—a gender marker that several countries besides the United States recognize.[18]

### C.     Plaintiff Mx. Saba is a Nonbinary Resident of New York.

61.     Plaintiff Sander Saba is a 26-year-old nonbinary transgender resident of New York City.

62.     Since childhood, Mx. Saba has never strongly associated with the gender of male or female.  Mx. Saba has always viewed gender roles as something prescribed onto them, not something that they internalized.

63.     Mx. Saba was born in Staten Island, New York, and has lived in New Jersey, Pennsylvania, and, most recently, New York City.

64.     When they were born, their sex was not designated as nonbinary on their birth certificate.  Nor was the legal name "Sander" recorded on their birth certificate, but rather a name that was assigned to them at birth.

65.     Though not then aware of the terms "nonbinary" or "transgender," Mx. Saba remembers not specifically identifying as either male or female from a young age.  This led to feelings of confusion about the meaning and implications of their birth-assigned sex.

---

[17] Am. Ass'n of Motor Vehicle Adm'rs, 2016 AAMVA DL/ID Card Design Standard 9 (2016), https://tinyurl.com/yxv4ovwm (last accessed May 3, 2021).

[18] *See* Machine Readable Travel Documents, ICAO Document 9303, Part IV at 14 (7th ed. 2015), https://tinyurl.com/y5n7ax8r (last accessed May 3, 2021).

66.     Despite this confusion, through middle school, Mx. Saba generally presented their gender based on societal expectations and assumptions associated with their birth-assigned sex.

67.     In high school, Mx. Saba began to explore their gender identity.  They started to associate with a significant number of norms and conventions for both genders while simultaneously not identifying with other norms and conventions typically associated with either gender.  For example, Mx. Saba stopped adhering to grooming styles and clothing standards stereotypically associated with their birth-assigned sex.  And when Mx. Saba's family members would occasionally split up based on traditional gender roles at family gatherings, Mx. Saba would often seek to be included in both groups.

68.     While attending college at the University of Pittsburgh, Mx. Saba applied for and received a Pennsylvania driver's license, which reflected their birth-assigned sex.

69.     In 2017, Mx. Saba accepted an offer of admission to Temple University's Beasley School of Law.  Before starting law school, Mx. Saba began to think about how they wanted to present themselves as they started their legal education and career.

70.     Mx. Saba realized that their gender identity did not match pronouns associated with their birth-assigned sex, with the way they had been presenting, or with the name given to them at birth. Around this time, Mx. Saba also began to use the gender-neutral pronouns "they" and "them."

71.     After completing their first year of law school, Mx. Saba transferred from the Beasley School of Law to New York University School of Law, moving to New York City in August 2018.

72.     In September 2018, Mx. Saba started seeing a therapist who specializes in LGBTQ-specific issues, including those related to sexual orientation and gender identity.  Mx. Saba was diagnosed with gender dysphoria in the fall of 2018.

73.     During this time, Mx. Saba began undergoing medical treatment for their gender dysphoria, including seeing a therapist, taking hormones, and other medically indicated treatment.

In addition to these treatments, Mx. Saba continued to align their lived experience with their gender identity.

74.    In October 2018, Mx. Saba legally changed their name to Sander, a name they felt better aligned with and affirmed their gender identity.

75.    In January 2019, Mx. Saba updated their Pennsylvania driver's license to include a gender-neutral designation of "X," a license that expired in November 2020.

76.    Around the same time that they updated their Pennsylvania driver's license, Mx. Saba updated their Social Security records to reflect their new legal name.

77.    In January 2020, Mx. Saba obtained a corrected New York City birth certificate with their accurate legal name and an accurate "X" gender marker designation.

78.    Mx. Saba currently resides in Queens County.  Following their graduation from law school on May 21, 2020, Mx. Saba began to reside in New York City with their spouse on a permanent basis.

79.    In November 2020, they began employment as an associate at Paul, Weiss, Rifkind, Wharton & Garrison LLP in New York City.

**D.    The Gender Marker Policy Fails to Recognize Nonbinary Residents.**

80.     The DMV is responsible for the issuance of, corrections to, and changes to New York drivers' licenses.

81.    A New York driver's license includes, among others, fields for the name and surname, the date of birth, the residential address, and the gender of a person, i.e., a "gender marker."

82.    The DMV's Gender Marker Policy limits the available gender markers to either male or female and is reflected in the procedures for a person to obtain a New York driver's license for the first time *or* to correct their gender marker on a previously issued driver's license.

83.     A New York resident seeking a first-time New York driver's license must complete Form MV-44, a three-page Application for Permit, Driver License or Non-Driver ID Card (the "Application").[19]

84.     The Application requires applicants to fill out fields requesting various identifying information.  One field requires applicants to fill out "GENDER," but only gives applicants two options—a "Male" box and a "Female" box—as excerpted below:

85.     An applicant is further required to sign the Application, which serves as a certification that, among other things, "the information [an applicant has] given on this application and on any documentation provided in support of this application is true and complete," as excerpted below:

---

[19] Department of Motor Vehicles, *Application for Permit, Driver's License, or Non-Driver ID Card*, https://tinyurl.com/j4zwhcd (last accessed May 3, 2021).

**CERTIFICATION**

I certify that the information I have given on this application and on any documentation provided in support of this application is true and complete.
I understand that making a false statement on this application, or submitting any documentation in support of this application that is false, may be punishable as a criminal offense.

If I am applying for a replacement document, I certify that my New York State document has been lost, stolen, or mutilated.

If I am transferring an Out-of-State Driver License to a New York State Driver License, I certify that, when I obtained my out-of-state driver license, I was a permanent resident of the state or province that issued the license, that license has been valid for at least 6 months, and I have not failed a driving skills road test in New York State in the last 12 months.

If I am applying for a Conditional or Restricted Use License, I certify that I will pay the full tuition and other required fees for the rehabilitation program (if applicable), attend the program (if required), and will drive within the conditions required for the restricted or conditional license. I understand that failure to do so will result in the revocation of my restricted or conditional license and the reinstatement of the suspension or revocation against my full license.

If I am a male at least 18 but less than 26 years old, unless I have opted "no" to United States Selective Service System (SSS) registration on Page 1, I hereby affirmatively opt to register with the SSS and consent to DMV forwarding my personal information to the SSS for registration.

| SIGN HERE | X | | DATE: __/__/__ |
| PLEASE PRINT NAME | | | |

| OFFICE USE | EYE TEST RESULTS | Applicant's Signature | Examiner's Initials |
| --- | --- | --- | --- |
| | ☐ Passed in Office   ☐ Vision Registry   ☐ Corrective Lens | | |

MV-44 (1/20)                                                                                           PAGE 2 OF 3

86.     This attestation requirement, combined with the limited options in the "GENDER" field, implements the Gender Marker Policy by ensuring that anyone seeking a New York driver's license must certify that their gender is either male or female.  This attestation is necessarily false for a nonbinary applicant.

87.     In addition, the DMV issues driver's licenses through an automated system which ties a person's driver's license with a unique motorist identification ("MI") number that serves as the principal means for identifying that person's driver's record.  Under the current policy, the MI number contains identification information for a person and includes a binary designation for a person's gender of "0" or "1" for "male" or "female."

88.     The MI number tied to a person's driver's license is the foundational core of a person's record and identification information.  It is transmitted whenever a person's driving record must be accessed by government authorities, such as law enforcement, county boards of election, and the U.S. Selective Service, as well as others, such as organ donation registries, insurance companies, and credit card companies.  This digitally stored identifying information tied to a person's driver's license is also transmitted whenever a person's driver's license is scanned.

89.     As such, under the Gender Marker Policy, a driver's license communicates a person's gender in two ways.  First, on the face of the document through an "M" or "F" marker. And second, electronically through the binary designation contained in the MI number.

90.     Recognizing that a gender designation on a previously issued New York driver's license may sometimes be inaccurate or need updating, Defendants allow New York residents to correct the gender marker on their driver's licenses.  Even in this context, however, New York implements its exclusive Gender Marker Policy.

91.     In order to correct a gender designation, the applicant must submit an Application, their current driver's license, and proof of a "gender change."  The proof of "gender change" must include a certification by an appropriate professional that "one gender is [the applicant's] primary gender and that [the applicant] identif[ies] *as male or female*."[20]  By requiring applicants to submit documentation that they are either female or male, the DMV excludes nonbinary residents from driver's licenses that accurately reflect their gender identity.

92.     To the extent this professional certification requirement for a proof of "gender change" means that Mx. Saba must select their birth-assigned sex when seeking a New York driver's license, the DMV Gender Marker Policy requires disclosing confidential and private information that is completely irrelevant to any government interest.

93.     For a nonbinary resident like Mx. Saba whose former out-of-state license, birth certificate, and social security card all accurately reflect their nonbinary gender identity, possessing a driver's license with binary designation either on its face, on the electronically stored information tied to the license, or both would be an inaccurate form of identification as it is inconsistent with their gender identity.

---

[20] *See* DMV, *How to change information on DMV documents*, https://tinyurl.com/y3qsr2py (last accessed May 3, 2021).

**E.      The DMV's Gender Marker Policy Is Inconsistent with New York's Solicitude for Transgender and Nonbinary Residents in Other Contexts.**

94.      The DMV's Gender Marker Policy is inconsistent with New York law, as recognized by the State in other contexts.

95.      On January 7, 2020, a transgender minor filed a lawsuit in New York federal court challenging a New York State policy barring transgender minors who are born in New York from obtaining birth certificates that accurately reflect their gender identity.  *See M.H.W. v. Cuomo*, 20-17 (N.D.N.Y. Jan. 7, 2020).

96.      On March 10, 2020, New York announced that it had settled the case and implemented new procedures to allow transgender minors to correct their sex designation on birth certificates.  In doing so, Attorney General Leticia James admitted that "plaintiffs rightfully argued that 'the government's refusal to recognize a person's sex not only denies a transgender person equal dignity and respect by undermining—even denying—their very existence, it also authorizes and invites other public and private entities to similarly discriminate and deny recognition.'"[21]

97.      On March 19, 2020, another lawsuit was filed by a nonbinary former resident of New York challenging the New York Department of Health's denial of a petition to update a birth certificate to include a nonbinary gender marker.  *See Cruse v. Zucker,* No. 903401/20 (N.Y. Sup. Ct. Mar. 19, 2020).

98.      On or about June 12, 2020, that case was settled, resulting in New York amending its policies for adults and minors to allow gender-neutral markers on New York birth certificates.[22]

99.      The DMV's Gender Marker Policy is also inconsistent with New York City's birth certificate policy, which similarly permits nonbinary residents, like Mx. Saba, to obtain a birth certificate with an "X" gender marker.  N.Y. City Health Code (24 RCNY) § 207.05.

---

[21] *See* Press Release, Attorney General James Announces Change To NYS Health Policy Allowing Transgender Minors To Correct Sex Designation On Birth Certificates (Mar. 10, 2020).

[22] *See* Milo Primeaux, Esq., *Victory! "X" Markers on NYS Birth Certificates*, https://tinyurl.com/y3fvvznn (last accessed May 3, 2021); *see also* Letter from Mary E. Hefner, New York State Registrar Bureau of Vital Records (June 12, 2020) (noting policy to allow changes in gender designation on birth certificates "including requests for nonbinary gender designations").

**F.** **A Representative of Commissioner Schroeder Confirms the DMV's Gender Marker Policy While Admitting It Is Contrary to New York Law and Denying Mx. Saba's Request for a New York Driver's License that Conforms to Their Nonbinary Gender Identity.**

100.    Under New York law, Mx. Saba is a New York resident for purposes of obtaining a driver's license.  *See* N.Y. VEH. & TRAF. LAW § 250(5) (McKinney 2019).

101.    To drive as a New York resident, Mx. Saba must obtain a New York driver's license within thirty days of becoming a resident.  *Id.* §§ 250(2), 509(1), 509(11).  In order to exchange their Pennsylvania driver's license for a New York driver's license, Mx. Saba must visit a DMV office and complete certain steps, including filling out the Application, which as described *supra*, requires them to incorrectly attest that their gender is either male or female.[23]

102.    After Mx. Saba's graduation in May 2020, the time period for which they could rely on their Pennsylvania driver's license—that accurately captures their gender identity with a "X" gender marker—was coming to a close.  Due to the COVID-19 pandemic, however, DMV offices in New York County were closed for in-person services.[24]

103.    Without the ability to personally exchange their license at the DMV and request a nonbinary gender marker on a New York driver's license, despite the exclusive Gender Marker Policy expressed in the Application, on May 26, 2020, Mx. Saba sent a letter to Commissioner Schroeder's office, requesting that the DMV "advise [them] on how [they] can obtain a New York driver's license with an X gender marker, or please confirm that the DMV's current policy prohibits nonbinary residents from having a New York driver's license that accurately reflects their gender identity."

---

[23] https://tinyurl.com/y76sjlse (last accessed May 3, 2021).

[24] On March 21, 2020, "[i]n compliance with Governor Cuomo's Executive Order 202.8 to slow the spread of COVID-19," the DMV announced that all DMV offices and auto bureaus statewide were closed for all in person services until Phase Three of the reopening process . Press Release, NYS DMV TO SUSPEND SERVICES IN RESPONSE TO COVID-19 PANDEMIC, (March 21, 2020) https://tinyurl.com/y9sghj9u (last accessed May 3, 2021).  New York City did not enter Phase Three of the reopening process until July 2020.

104.    On July 7, 2020, Mx. Saba received a telephone call from Brandon Flynn, who identified himself as an employee of the DMV within the New York Licensing Bureau tasked with responding to Mx. Saba's May 26 letter.

105.    Mr. Flynn confirmed that the DMV would deny Mx. Saba's request to issue a New York driver's license that accurately reflected their gender identity.  Mr. Flynn acknowledged that New York law guarantees Mx. Saba's access to New York state services free from discrimination based on sexual orientation and gender identity.  Nevertheless, Mr. Flynn explained that the DMV would not do so in Mx. Saba's case because it had set up its computer system to require either an "M" or an "F" gender marker on New York driver's licenses.  This, Mr. Flynn explained, meant that the DMV would not issue Mx. Saba a New York driver's license with an accurate "X" gender marker.

106.    Mr. Flynn explained that the DMV was in the process of updating its computer system, but could not answer whether this process would include an option for an "X" gender marker for New-York-issued licenses.

107.    Mr. Flynn's explanation is the only one Defendants have offered to justify adopting and enforcing a Gender Marker Policy prohibiting nonbinary residents from obtaining a driver's license that accurately reflects their gender identity.

108.    Under the Gender Marker Policy, Defendants denied Mx. Saba's request to issue a driver's license with an X gender marker, despite the fact that Mx. Saba could comply with all other DMV's policies to receive such a license.

109.    Despite the nonbinary gender designation listed on their other government identification documents, the DMV's driver's license policy prohibits Mx. Saba from obtaining a New York driver's license that correctly identifies their nonbinary gender identity.

110.    Defendants have made it impossible for Mx. Saba to comply with New York's law. Mx. Saba, a New York resident, must either falsely attest that they are male or female in the Application, in violation of New York law, or else must use a Pennsylvania driver's license rather than a New York driver's license, also in violation of New York law.

**G.     The DMV's Litigation Offer to Issue Mx. Saba a Manually Generated Driver's License**

111.    Following Mx. Saba's initiation of this action, the DMV offered Mx. Saba, and only Mx. Saba, the ability to apply for a New York State driver's license through a manual process that would not require Mx. Saba to indicate a gender on the Application and that will permit DMV to issue a license to Plaintiff that would bear an "X" gender marker on its face, but not electronically.

112.    To complete the manual process the DMV advised Mx. Saba that they needed to submit a completed new license application except for the gender question, which they would permit Mx. Saba, and only Mx. Saba, to leave blank.

113.    Once the application was received and other requirements met, the DMV would make a binary gender selection for Mx. Saba to create an MI number, notwithstanding Mx. Saba's nonbinary identity, and would cause a license to be manually created for Mx. Saba by the DMV's license production vendor that bears an 'X' gender identification marker on its face.  However, the binary gender selection made by DMV in order to generate the MI number tied to Mx. Saba's license would be incorporated into DMV records for Mx. Saba and would be accessible to third parties who request the records or whenever Mx. Saba's license is scanned.

114.    Because the DMV's offer for a manually generated license for Mx. Saba only applies to them and the gender marker on the face of the license would differ from the gender marker communicated electronically whenever the license is scanned or the DMV records are accessed, the DMV offered to provide Mx. Saba with a letter that confirms the license is genuine and has not been otherwise altered.

115.    To be clear, even under the DMV's offer motivated by litigation, Mx. Saba's driver's license would contain an inaccurate gender designation on the back end and would inaccurately communicate Mx. Saba's identity whenever the license is scanned, or the electronic records inextricably tied to the driver's license are transmitted.

**H.     The DMV's Gender Marker Policy Harms Nonbinary Residents Like Mx. Saba**

116.    Plaintiff has been, and continues to be, injured by Defendants' conduct.

117.    Mx. Saba reasonably believes that possessing a driver's license that fails to accurately reflect their gender increases the chance that they will be subjected to prejudice, discrimination, harassment, humiliation, and violence.

118.    A driver's license is a trusted and essential government-issued document that serves as proof of a person's identity.  Many parties—both public and private—rely on state-issued driver's licenses to verify a person's identity.  These include employers seeking to hire and onboard new employees, educational institutions enrolling new students, and the United States Department of Homeland Security clearing ticket-holders at airports to board commercial planes, to name a few.

119.    A driver's license also reflects the government's recognition of a person's identity, including the person's gender, just as a marriage certificate reflects governmental recognition of a person's relationship.

120.    The Gender Marker Policy conveys a message from the State of New York that there are only two valid gender identities:  male and female.  This message is inconsistent with New York law and contradicted by medical consensus, Mx. Saba's experience, and the experience of other transgender and nonbinary New York residents.

121.    Through the Gender Marker Policy, the DMV has announced that it does not recognize Mx. Saba for who they are and does not acknowledge their personhood.  This is a violation of their dignity and autonomy.

122.    Forcing nonbinary residents to choose between male and female gender markers, whether on the face of a document or on the electronic back end, stigmatizes their nonbinary gender identity and prevents them from taking steps to align their lived experience with the identity.

123.    Indeed, to the extent the Gender Marker Policy requires Mx. Saba to disclose their birth-assigned sex, it requires Mx. Saba to disclose it not only to the DMV, but to every public entity or private person to whom they show their driver's license or who access electronic records tied to the license.

124.    The DMV's Gender Marker Policy not only articulates its policy of erasing nonbinary residents, but also forces them to participate in their own erasure.  All New York citizens must present valid driver's licenses in a variety of social circumstances and for various reasons, including for employment, at airports, hotels, and for admittance to government and other buildings.  By forcing Mx. Saba and other nonbinary residents to choose between "male" or "female" on their Application, the Gender Marker Policy conditions their receipt of the license on attesting to an inaccurate gender identity.  Alternatively, by forcing Mx. Saba to possess a driver's license bearing binary gender designation on the MI number and electronic records tied to that license, the Gender Marker Policy conditions their receipt of the license on possessing identification that inaccurately communicates their gender identity.

125.    Moreover, each time a nonbinary person presents a New York driver's license, they are forced to bear the State's message that there are only two genders (male or female), a message to which Mx. Saba strongly objects and which contradicts their own gender identity and beliefs.  Forcing nonbinary residents to formally identify with a gender that does not reflect their outward presentation inevitably leads to questioning about their gender, as the DMV's offer to Mx. Saba to carry an explanatory letter in relation a manually generated license illustrates.  As a result, nonbinary residents may avoid using services that may require the use of identification for fear of harassment or discrimination.

126.    Forcing Mx. Saba to pick or possess a gender marker other than X on their driver's license and the MI number and electronic records tied to it frustrates Mx. Saba's social transition.  Those presented with a form of identification are under an obligation to determine whether the identification presented is authentic.  This obligation can lead to intrusive questioning when the

gender marker listed on the license does not accurately reflect that of the person presenting the license.

127.    Mx. Saba has personally experienced the stigma of having a driver's license that does not accurately reflect their gender identity. When forced to present such inaccurate identification, Mx. Saba experienced similar discomfort to when they were asked what their "real" gender is, by which they understand their questioner to be asking about their birth-assigned sex.

128.    A transgender person's birth-assigned sex is highly private and intimate information. Mx. Saba found the involuntary disclosure of this information deeply intrusive. And it was all the more invasive when done with the imprimatur of the government implied by listing this information on state-issued identification.

129.    Mx. Saba often became nervous and unconformable presenting identification listing an inaccurate gender identity before obtaining their gender-affirming Pennsylvania license. In public situations where displaying a license was required, Mx. Saba received uncomfortable stares and questions relating to their gender identity and physical body. Often, this disaffirmation and questioning was enough to keep Mx. Saba from going out to public places.

130.    Forcing Mx. Saba to pick or possess a gender marker other than X on a New York driver's license and the MI number and electronic records tied to it also interferes with required medical care, related and unrelated to their gender identity. During these visits, Mx. Saba must fill out forms that ask for their gender and present a driver's license or other form of state identification. Without a New York driver's license that accurately reflects their gender identity, Mx. Saba is likely to be incorrectly gendered, commonly referred to as "misgendering," which would interfere with their access to medical care.[25]

131.    Now that Mx. Saba is a resident of New York County but lacks a valid New York state driver's license, they are without opportunity to enjoy equal access to public

---

[25] To misgender is to "[r]efer to (someone, especially a transgender person) using a word, especially a pronoun or form of address, that does not correctly reflect the gender with which they identify." Misgender, Oxford University Press, www.lexico.com/en/definition/misgender (last accessed May 3, 2021).

accommodations, unable to drive on public highways, and will face difficulties entering secured buildings, courthouses, and airports.

132.    Mx. Saba suffers an ongoing, irreparable injury from the DMV Gender Marker Policy, a policy that violates Mx. Saba's constitutional rights, as well as denies statutory rights set forth in New York law.

133.    Remedies available at law are inadequate to compensate for the injury Mx. Saba suffers and will continue to suffer because of the DMV's unlawful Gender Marker Policy.

134.    The hardship that Mx. Saba is suffering as a result of the DMV's unlawful Gender Marker Policy is significant, which includes the violation of their constitutional rights.  Moreover, Mx. Saba is forced to forego the benefits associated with a New York driver's license.  Finally, Mx. Saba is treated differently from those who identify as one of the binary gender identifiers, whose identities are readily recognized by the Application.  By contrast, New York will face little burden by including an X gender designation on the Application, the face of driver's licenses, and the MI numbers and electronic records tied to the license.  New York can rectify these injuries by including a separate gender-neutral designator on the Application and license.

135.    The public interest would be served by a permanent injunction of the Gender Marker Policy.  Recognizing nonbinary gender identities furthers the rights of nonbinary New York residents without creating injuries to those who have a binary gender identity.  Including X gender designations on New York driver's licenses and the MI numbers and electronic records tied to the licenses simply adds to and expands the list of existing designations.  Moreover, providing an X gender marker option provides better and higher quality information on licenses and their related records and ensures consistency within the State's identification system without significant cost to Defendants.

136.    Defendants' administration and enforcement of the DMV's Gender Marker Policy are actions under color of state law.

137.    Mx. Saba brings this case to challenge the Gender Marker Policy both facially and as applied by the Defendants to them, in order to remedy the violation of their constitutional rights and right to enjoy the benefits of places of public accommodation without discrimination.

## CAUSES OF ACTION

### COUNT I - DEPRIVATION OF EQUAL PROTECTION IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION 42 U.S.C. § 1983

138.    Plaintiff hereby incorporates by reference and realleges all of the preceding paragraphs of this Complaint as though fully set forth herein.

139.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.

140.    <u>Illegal Sex-Based Classification</u> - The DMV's Gender Marker Policy requires Mx. Saba to select either "male" or "female" on their application.  It cannot be stated without referencing sex.

141.    By forcing Mx. Saba to classify themselves as either male or female on the application for a driver's license and on the MI number and electronic records tied to the license, the DMV's Gender Marker Policy, as enforced by Defendants, facially and intentionally discriminates against Plaintiff and other residents based on sex-related considerations.

142.    <u>Sex Stereotyping</u> - The DMV's Gender Marker Policy is also impermissibly premised on assumptions, expectations, stereotypes, or norms about the nature of gender identity as a binary characteristic of either male or female.

143.    The DMV's Gender Marker Policy excludes Mx. Saba from obtaining an accurate driver's license because Mx. Saba fails to conform to the sex-based stereotype that all individuals are either male or female.

144.    <u>Protected Class</u> - Government discrimination against transgender people because of their transgender status bears indicia of a suspect classification requiring strict scrutiny by the courts:

a)  Transgender people, especially those who identify as nonbinary, have suffered a long history of extreme discrimination in New York and across the United States, and continue to suffer such discrimination at present;

b)  Transgender people have historically endured prosecution and discrimination;

c)  A person's transgender status, including those who are nonbinary, bears no relation to a person's ability to contribute to society;

d)  Transgender people, including those who are nonbinary, are a discrete group with obvious, immutable, or distinguishing characteristics that define the group; and,

e)  Transgender people lack the political power to protect their rights through the legislative process.

145.    For all of these reasons, the DMV's Gender Marker Policy is subject to heightened scrutiny.

146.    The DMV's Gender Marker Policy is not narrowly tailored to serve a compelling state interest, or substantially related to an important government interest.

147.    Based on the DMV's Gender Marker Policy, Defendants denied Mx. Saba's request for a driver's license with a gender marker that accurately reflected their gender identity.

148.    The DMV's Gender Marker Policy and Defendants' denial of Mx. Saba's request for a driver's license with a gender marker that accurately reflects their gender identity therefore violates Mx. Saba's right to equal protection and violates the Fourteenth Amendment to the United States Constitution.

**COUNT II - DEPRIVATION OF DUE PROCESS IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION 42 U.S.C. § 1983**

149.    Plaintiff hereby incorporates by reference and realleges paragraphs 1-149 of this Complaint as though fully set forth herein.

150.    The Fourteenth Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.

151.    <u>Intrusion on Fundamental Autonomy and Decisional Privacy Rights</u> - The Due Process Clause protects the right of every person to the possession and control of their own person, and to define and express their identity.  These protections extend to personal decisions central to individual dignity and personal autonomy such as intimate decisions pertaining to one's ability to define and express one's personal identity.

152.    The right to define and express one's gender identity, without interference from the state, is among the most intimate, relating to matters that individuals are uniquely positioned to understand and define for themselves.  It is safeguarded as part of the fundamental right to decisional privacy and the constitutionally protected liberty interests to individual dignity and autonomy.

153.    When the State of New York denies recognition of a nonbinary person's gender, it necessarily imposes significant harms on that person.  New York's refusal to recognize a person's gender not only denies a nonbinary person equal dignity and respect by denying their very identity and existence, but it also authorizes and invites other public and private entities to similarly discriminate and deny recognition.

154.    By enforcing the DMV's Gender Marker Policy, Defendants unduly burden and unconstitutionally interfere with the fundamental right to autonomy over one's person and identity guaranteed to all nonbinary persons in New York, including Mx. Saba.

155.    The State of New York has no compelling, important, or legitimate, interest in interfering with the rights of nonbinary persons to self-definition and autonomy in their person and identity.

156.    <u>Intrusion on Fundamental Privacy Rights</u> - The Due Process Clause and other constitutional provisions confer a right to privacy, protecting information that is highly personal and intimate.

157.   A transgender person's birth-assigned sex is highly personal and intimate information. A reasonable person would find the involuntary disclosure of a transgender person's birth-assigned sex to be deeply intrusive.

158.   To the extent that the DMV's Gender Marker Policy requires Mx. Saba to disclose their birth-assigned sex or binary designation contained within the MI number and electronic records tied to a driver's license, it requires Mx. Saba to disclose it to not only the DMV, but to every public and private entity or person to whom they present their driver's license or access those records.

159.   This involuntary disclosure is not narrowly tailored to further a compelling government interest.

160.   <u>Impossibility of Compliance</u> - The Due Process Clause also requires that statutes and regulations be supported by a rational basis and sufficiently definite to provide fair warning to ordinary people as to what is prohibited and what is permissible under the law.

161.   By enforcing the DMV's Gender Marker Policy, Defendants have constructed a legal regime under which nonbinary residents of New York, including Mx. Saba, cannot comply with the law. Mx. Saba must either falsely state that they are male or female as part of the driver's license application in violation of New York law, or drive in New York without a New York driver's license in violation of New York law.

162.   Because it is impossible for Mx. Saba to comply with the DMV's Gender Marker Policy, it therefore creates a legal regime that is both unconstitutionally vague and not rationally related to any legitimate government interest.

163.   Based on the Gender Marker Policy, Defendants denied Mx. Saba's request for a driver's license with a gender marker that accurately reflects their gender identity.

164.   The DMV's Gender Marker Policy and denial of Mx. Saba's request for a driver's license with a gender marker that accurately reflects their gender identity therefore violates Mx. Saba's right to due process under law and violates the Fourteenth Amendment to the United States Constitution.

## COUNT III - ABRIDGEMENT OF FREE SPEECH IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
## 42 U.S.C. § 1983

165.    Plaintiff hereby incorporates by reference and realleges paragraphs 1-165 of this Complaint as though fully set forth herein.

166.    The Free Speech Clause of the First Amendment to the United States Constitution, enforceable through to 42 U.S.C. § 1983 and applicable to the States through the Fourteenth Amendment, provides that a state "shall make no law . . . abridging the freedom of speech."

167.    The Free Speech Clause of the First Amendment ensures not only the right to speak and express oneself, but also the right to refrain from speaking.

168.    The DMV's Gender Marker Policy compels Mx. Saba to state a gender identity that is false whenever they apply for n a government-issued driver's license, or whenever they need to produce a driver's license that would be an inaccurate gender designation on its face or on its related MI number and electronic records.

169.    The DMV's Gender Marker Policy also restricts Mx. Saba's right to speak by prohibiting them from accurately stating their gender identity on their driver's license and related electronic records.

170.    The DMV's Gender Marker Policy further violates Mx. Saba's First Amendment right to refrain from speaking, compelling them instead to endorse the State of New York's position as to their own gender identity, both to the State and to anyone to whom they must show state-issued identification.  That Mx. Saba must choose either a male or female gender marker in order to obtain a New York driver's license even though neither option is truthful or accurate, compels them to convey the state's message that there are only two genders (male or female), a message that is inconsistent with the medical and scientific understanding of gender and to which Plaintiff strongly objects.

171.    The DMV's Gender Marker Policy is not narrowly tailored to serve any compelling governmental interest.

172.    Based on this Gender Marker Policy, Defendants denied Mx. Saba's request for a driver's license with a gender marker that accurately reflected their gender identity.

173.    The DMV's Gender Marker Policy and denial of Mx. Saba's request for a driver's license therefore violates Mx Saba's right to free speech under the First Amendment to the United States Constitution.

### COUNT IV - VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW N.Y. EXEC. LAW § 296

174.    Plaintiff hereby incorporates by reference and realleges paragraphs 1-174 of this Complaint as though fully set forth herein.

175.    The New York State Human Rights Law, N.Y. Exec. Law § 296(2)(a), provides, in relevant part, that:

> It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the … gender identity or expression, … sex, … of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof … .

176.    Defendants are owners, lessees, proprietors, superintendents, managers, agents, or employees of (1) DMV offices, and (2) public roadways.

177.    The DMV's offices are places of public accommodation under N.Y. Exec. Law § 292(9) because they deal with driver's licenses and other related services, such as providing parking permits for those with disabilities, registering organ donors, and facilitating voter registration applications.

178.    Public roadways are places of public accommodations, including because they are public areas of a structure and are an integral part of public conveyances operated on land.

179.    Through the DMV's Gender Marker Policy, Defendants have denied Mx. Saba the accommodations, advantages, facilities, or privileges of the DMV's offices and public roadways because of their gender identity or expression, and their sex.

180.    Additionally, gender dysphoria is a disability within the meaning of New York State Human Rights Law.

181.    Through the DMV's Gender Marker Policy, Defendants have a policy of denying Mx. Saba the accommodations, advantages, facilities, or privileges of based on their disability. N.Y. Exec. Law. § 296(2)(a).

182.    Alternatively, through the DMV's Gender Marker Policy, Defendants have burdened Mx. Saba's ability to access places of public accommodation based on gender identity, sex, and disability.  Passing security for air travel, entry into many office buildings and courthouses, hotels, other social spaces all require state-issued identification such as a driver's license.

183.    Based on the Gender Marker Policy, Defendants denied Mx. Saba's request for a driver's license with an "X" gender marker that accurately reflected their nonbinary gender identity and refuse to provide Mx. Saba a driver's license that accurately portrays their gender identity, on its face and through electronic means.

184.    The Gender Marker Policy and denial of Mx. Saba's request for a driver's license therefore violates their right to access public accommodations without unlawful discrimination under New York Human Rights Law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the Court acts as follows:

a.      Enter a declaratory judgment that the actions of Defendants complained of herein, including the enforcement of New York's Gender Marker Policy, are in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the Free Speech Clause of the First Amendment to the United States Constitution; and New York Human Rights Law's provisions prohibiting unlawful discriminatory practices in places of public accommodation;

b.      Permanently enjoin Defendants, their agents, employees, representatives, and

successors, and any other person acting directly or indirectly in concert with them, from enforcing New York's Gender Marker Policy, including from refusing to provide driver's licenses that accurately reflect and communicate a nonbinary individuals' gender identity through the use of an "X" gender marker on their face and electronically;

c.      Order Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, to update the Application to include an "X" gender marker for nonbinary applicants;

e.      Award Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees; and

f.      That Plaintiff have such other, further, or different relief as may be permitted and required and the Court deems just and proper under the circumstances.

Dated:  May 7, 2021

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.


Omar Gonzalez-Pagan
*ogonzalez-pagan@lambdalegal.org*
Carl S. Charles
*ccharles@lambdalegal.org*
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile:   (212) 809-0055

Respectfully submitted,

O'MELVENY & MYERS LLP


By: /s/ *Hannah Y. L. Chanoine*
    Hannah Y. L. Chanoine
    *hchanoine@omm.com*
    Amanda L. Genovese
    *agenovese@omm.com*
    Shane A. Hunt
    *shunt@omm.com*
    Times Square Tower
    7 Times Square
    New York, NY 10036
    Telephone:   (212) 326-2000
    Facsimile:   (212) 326-2061

    Dimitri Portnoi
    *Pro hac vice*
    *dportnoi@omm.com*
    400 South Hope Street, 18th Floor
    Los Angeles, CA 90071-2899
    Telephone:  (213) 430-6000
    Facsimile:  (213) 430-6407


*Attorneys for Plaintiff*